NO. 17-6466

IN THE UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

———————————————

UNITED STATES OF AMERICA

Plaintiff/Appellee

v.

**RODOLFO IBARRA-BANUELOS**

Defendant/Appellant

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE, AT GREENEVILLE
———————————————————————————————————————
————

BRIEF OF DEFENDANT/APPELLANT
———————————————————————————————————————
————

JAMES T. BOWMAN                    HELEN NICOLE HIMEBAUGH
Attorney At Law (BPR 000949)       Attorney At Law (BPR 027684)
128 East Market Street             128 East Market Street
Johnson City, Tennessee 37604      Johnson City, Tennessee 37604
(423) 926-2022                     (423) 557-5321
jimbobbowman@gmail.com             legalhelp1001@gmail.com

Attorneys for Defendant/Appellant

**TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES………………………………………………… 3

JURISDICTIONAL STATEMENT………………………………………… 4

STATEMENT OF ISSUE PRESENTED FOR REVIEW……………… 5

STATEMENT OF THE CASE……………………………………………… 5

STATEMENT OF THE FACTS…………………………………………. 6

SUMMARY OF THE ARGUMENT………………………………….. 37

ARGUMENT…………………………………………………………….. 38

CONCLUSION…………………………………………………….. 41

CERTIFICATE OF COMPLIANCE……………………………….. 41

ADDENDUM……………………………………………………………. 42

# TABLE OF AUTHORITIES

**CASES**                                                                      **PAGE**

United States v. Clayton, 418 F.2d 1274 (6th Cir., 1969)……………   41

Griffith v. Kentucky, 479 U.S. 314, 322 (1987)……………………..   38, 40

Carpenter v. United States,

      16-402 (United States Supreme Court, decided June 22, 2018)..  38, 40

U.S. v Stulga, 548 F 2d 142 (6th CCA, 1978)………………………   39

**STATUTES AND OTHER AUTHORITIES**

18 U.S.C. § 2……………………………………………………….   4

18 U.S.C. § 1956(h)……………………………………………….   4

18 U.S.C. § 3231…………………………………………………...   4

21 U.S.C. § 846……………………………………………………   4

21 U.S.C. §841(b)(1(A))…………………………………………...   4

21 U.S.C. §841(b)(1)(B)…………………………………………..   4

21 U.S.C. § 841(a)(1)……………………………………………..   4

28 U.S.C. § 1291…..………………………………………………   5

Rule 4(b), Federal Rules of Appellate Procedure……………………   5

# INTRODUCTION

This is an appeal by Rodolfo Ibarra Banuelos, hereinafter referred to as Ibarra, from his convictions for drug conspiracy, money laundering, and aiding and abetting drug distribution.  References to the record will be as follows - description of item; record (document #), abbreviated "R"; and transcript page.  For example: Transcript, R. 529,  Page ID# 22.

# JURISDICTIONAL STATEMENT

The District Court had jurisdiction in this matter pursuant to 18 U.S.C. § 3231, which provides as follows: "The District Courts of the United States shall have original jurisdiction, exclusive of the courts of the states, of all offenses against the laws of the United States."

The defendant, Rodolfo Ibarra-Banuelos was charged with and convicted of violation of the following criminal statutes: 21 U.S.C. § 846; 21 U.S.C. §841(b)(1(A)), Conspiracy To Distribute and To Possess With the Intent to Distribute 50 Grams or More of Actual Methamphetamine; 18 U.S.C. § 1956(h), Conspiracy To Commit Money Laundering; 21 U.S.C. § 841(a)(1), 21 U.S.C. §841(b)(1)(B) and 18 U.S.C. § 2, Aiding and Abetting the Distribution of Methamphetamine; 21 U.S.C. § 841(a)(1), 21 U.S.C. §841(b)(1)(A) and 18 U.S.C. § 2, Aiding and Abetting the Distribution of Methamphetamine (Superseding Indictment, Counts 2, 4, 48, 49, and 50, R. 40; Judgment, R. 513).

On June 7, 2017, Ibarra was found guilty at a jury trial proceeding as to all five of the charges (Minute Entry, R. 438;  Jury Verdict (redacted); Jury Verdict (unredacted), R. 440). 0n November 21, 2017, the defendant was sentenced to a total term of 360 months as to each of Counts 2, 49 and 50, twenty years as to

Count 4 and 360 months as to Count 48 to be served concurrently for net sentence of 360 months (Minute Entry, R. 512; Judgment, R. 513). Notice of Appeal was filed on December 6, 2017 (Notice of Appeal, R. 518), which was fifteen days after entry of judgment. The defendant/appellant filed a Motion For Extension of Time To File Notice of Appeal (R. 530, Motion For Extension of Time To File Notice of Appeal). The motion was granted by the district court on June 12, 2018 (R. 531, Order).

This appeal is from a final judgment that disposes of all parties' claims.

This Court has jurisdiction in this case pursuant to 28 U.S.C. § 1291 and Rule 4(b), Federal Rules of Appellate Procedure.

## STATEMENT OF ISSUE PRESENTED FOR REVIEW

1. The issue presented for review is whether evidence of the defendant's cell-site location information (CSLI) offered by the government through the testimony of Allen Pack and Robert Clayton Simmonds should have been admitted in light of the subsequent decision by the United States Supreme Court in the case of Carpenter v. United States, 16-402 (decided June 22, 2018).

## STATEMENT OF THE CASE

The defendant was originally arrested upon a complaint issued on 08/28/2015, R. 3. Subsequently he was indicted on 09/09/2015, R. 18. The Federal Defender was appointed to represent him on 08/28/2015, R. 7. A superseding indictment was returned on 10/15/2015, R. 40. On 12/13/2016, the Federal Defender filed a motion to withdraw as counsel, R.367, which motion was granted on 16/16/2016, and James T. Bowman was appointed as counsel for the

defendant, R. 374. On 04/07/2017, Helen Nicole Himebaugh was appointed as co-counsel for the defendant, R. 417. Trial of this case began on 06/05/2017, R. 434. The jury returned its verdict on 06/07/2017, R. 440. Sentence was imposed on 11/21/2017, Judgment, R. 513. Notice of Appeal was filed 12/06/2017, R. 518. Order allowing late filing of Notice of Appeal was entered on 06/12/2018, R. 531

## STATEMENT OF FACTS

Jared Nail, of the Frederick County, Virginia Sheriff's Office testified he was working on a methamphetamine investigation on January 24, 2013, and executed a search and subsequent arrest of Jose Ibarra-Ayon's residence in, Clark County, Virginia. Transcript, R. 527, Page ID# 2-3. Ibarra-Ayons's girlfriend was present at the residence and she consented to the search of the dwelling. Transcript, R. 527, Page ID# 7. Nail found an identification card with a photo of the Defendant, Rodolfo Ibarra-Banuelos, in one of the bedrooms, and Nail identified the Defendant seated at defense counsel's table. Transcript, R. 527, Page ID# 6. Nail also found $5,600 US cash, clear plastic packaging, a piece of mail addressed to the Defendant at another address, a clear plastic bag tied at the top; and Nail testified he believed these items were all indications of illegal drug sales. Transcript, R. 527, Page ID# 12-13. Items found in the other bedroom were purported to be Jose Ibarra-Ayon's bedroom; to wit: a cardboard box containing a CD case which were hidden digital scales, a roll of plastic wrap, narcotics wrapped up in paper, US currency in a vest, and a container of baking soda believed to be used in illegal drug sales. Transcript, R. 527, Page ID# 9-10.

On cross-examination Nail testified the undercover investigation originally led them to Jose Ibarra for sale of methamphetamine. Transcript, R. 527, Page ID# 20. Nail confirmed that the Defendant was not present when they searched the property. Transcript, R. 527, Page ID# 20. Nail also acknowledged that no actual

methamphetamine was found in the room believed to be the Defendant's bedroom; but for a piece of a plastic wrapper not containing any illegal substances. Transcript, R. 527, Page ID# 21-22. In fact all the narcotics found in the home likely belonged to Jose Ibarra-Ayons; and the Defendant was not charged initially, as a result of the search of his son's residence. Transcript, R. 527, Page ID# 24-25.

John Brian Padgett, an agent of the Drug Enforcement Administration (DEA) based in Winchester, Virginia testified he was working on a methamphetamine case with the Virginia State Police Drug Task Force; and in particular a case targeting Dean Roberson, who subsequently sold methamphetamine to undercover officers in two controlled buys. Transcript, R. 527, Page ID# 34-35. A third controlled undercover buy was completed; however, in this controlled buy, Roberson sold them fake drugs. Transcript, R. 527, Page ID# 35. Roberson's arrest eventually led to the arrest of Agustin Solis-Viveras and Jose Ibarra-Ayon. Transcript, R. 527, Page ID# 36-37. Padgett confirmed they found 20.4 grams of methamphetamine in Jose Ibarra-Ayon's bedroom leading to his arrest. Transcript, R. 527, Page ID# 38.

When Padgett interviewed the Defendant, he denied any knowledge or possession of the methamphetamine found in Jose Ibarra-Ayon's home. Transcript, R. 527, Page ID# 38-39. Padgett identified the Defendant seated at defense counsel's table. Transcript, R. 527, Page ID# 40. Padgett testified as to a lease agreement listing Rodolfo Ibarra and Jose Luis Ibarra as tenants for the same residence at 13869 North Fairfax Highway in Boyce, Virginia. Transcript, R. 527, Page ID# 41. A rental application listed Jose Luis Ibarra, Rodolfo Ibarra, and Joselin Cuevas as occupants. Transcript, R. 527, Page ID# 42.

Allen Pack, a Special Agent for the FBI office in Johnson City, Tennessee Office testified he was worked on a methamphetamine conspiracy regarding distribution to individuals in the Hamblen County area and Northeast Tennessee. Transcript, R. 527, Page ID# 49. Pack testified as to known practices of

methamphetamine trafficking and the typical structure of a drug conspiracy ring and the distribution of those drugs. Transcript, R. 527, Page ID# 59-60. Methods of communication between members of the drug conspiracy ring generally involve cellular phones, obtaining toll records, detailed call records and text messages, phone numbers and texts sent and received on those cellular phones including the duration of those calls, a pen registry, and historical cell cite information. Transcript, R. 427, Page ID# 60-64. The Defendant, Ibarra, provided law enforcement with a phone number during his initial interview and a cell phone was recovered at the residence located at 13869 North Fairfax Highway in Boyce, Virginia; and this number was later associated with the phone number provided by the Defendant. Transcript, R. 527, Page ID# 64-65.

Pack detailed how law enforcement would utilize pen registers and phone numbers to learn who was involved in illegal drug conspiracies; and in particular one number purporting to belong to Kathy Fawbush, a co-defendant in this case. Transcript, R. 527, Page ID# 68. On July 15, 2015, an undercover controlled buy involved the use of two confidential informants to solicit and purchase methamphetamine from Kathy Fawbush. Transcript, R. 527, Page ID# 69. In the July 15, 2015 controlled buy law enforcement used two Hispanic confidential informants to conduct a controlled buy at Kathy Fawbush's residence; wherein one of the confidential informants was already known to Fawbush. In this controlled buy they hoped the known confidential informant would introduce and vouch for the second unknown confidential informant ("Ron") so that he would be able to continue purchasing methamphetamine from Fawbush. Transcript, R. 527, Page ID# 73. The controlled buy on July 15, 2015, at Fawbush's residence netted two (2) ounces of methamphetamine at $1,200.00 each. The confidential informants paid Fawbush $2,000 US currency, and there remained $400 due to Fawbush for the rest of the methamphetamine. Transcript, R. 527, Page ID# 73-74. The audio clip from this sale was admitted as an Exhibit. Transcript, R. 527, Page ID# 78.

Two other controlled buys led them to purchase methamphetamine from Juan Solis, a man known as "Bird". Transcript, R. 527, Page ID# 71.

Pack detailed a second undercover confidential informant controlled purchase at Fawbush's residence on July 24, 2015. Transcript, R. 527, Page ID# 79. The second confidential informant, known to the parties as "Ron", returned to Fawbush's residence to pay her the $400.00 balance from the previous controlled buy. Transcript, R. 527, Page ID# 79. The second confidential informant, Ron, was outfitted with a recording device instead of a transmitter in the first controlled buy. Transcript, R. 527, Page ID# 79. The only evidence from the second controlled buy was the audio recording and an officer's observations of the confidential informant's car driving up the driveway of Fawbush's residence. Transcript, R. 527, Page ID# 79-80. This transaction did not net any further sale of methamphetamine; instead, it was for the sole purpose of repaying the $400 balance to Fawbush and the discussion of future purchases of larger amounts of methamphetamine in an effort to learn more about Fawbush's supplier. Transcript, R. 527, Page ID# 80.

A subsequent controlled buy occurred at Fawbush's residence on August 27, 2015, wherein two confidential informants, "Ron" as previously discussed, and "Paco", a new confidential informant. Transcript, R. 527, Page ID# 83-84. The informants were not equipped with a transmitter for this controlled buy which netted law enforcement with one-half (1/2) an ounce of methamphetamine. Transcript, R. 527, Page ID# 85. An audio was produced of this controlled buy and it was admitted to evidence as an Exhibit. Transcript, R. 527, Page ID# 87. Two other individuals were believed to be present at Fawbush's residence during this controlled buy; who were later identified as Munsey Killion and the defendant in this case. Transcript, R. 527, Page ID# 83-84.

Pack testified a search warrant was obtained for Fawbush's residence on August 27, 2015, and another controlled buy by the same two informants, Ron and

Paco, was executed to confirm the two individuals, Killion and Ibarra, were present and participating in the controlled buy. Transcript, R. 527, Page ID# 88-90. Pack noted a car registered to the defendant, Ibarra, was parked in Fawbush's driveway. Transcript, R. 527, Page ID# 90. This controlled buy netted four (4) ounces of methamphetamine. Transcript, R. 527, Page ID# 91. In this controlled buy the methamphetamine was purchased from Misty Munsey Killion. Transcript, R. 527, Page ID# 92. Another individual, Summer Jones, was present at the Fawbush residence and answered the door when the informants arrived. Transcript, R. 527, Page ID# 93. A short time after this controlled buy on August 27th, officer executed a search warrant and this search confirmed the individuals at Fawbush's residence were Fawbush, Killion, and the defendant, Ibarra. Transcript, R. 527, Page ID# 93, 97.

Several cell phones, a Samsung and a ZTE, were recovered and/or seized from the defendant on August 27, 2015. Transcript, R. 527, Page ID# 97-98. Pack interviewed Ibarra on site while sitting in his law enforcement vehicle; however, Ibarra informed him that he did not speak English. Pack personally drafted a Waiver of Miranda on a piece of paper which Ibarra signed. Transcript, R. 527, Page ID# 99-100. During the interview, Ibarra denied knowledge of Fawbush selling methamphetamine; instead, Ibarra informed Pack he was a mechanic and working on a Jeep Cherokee for Fawbush the she intended to purchase. Transcript, R. 527, Page ID# 101-103. Pack acknowledged there was a Jeep Cherokee parked at the residence and it appeared that Ibarra may have been working on the vehicle. Transcript, R. 527, Page ID# 103. Ibarra claimed he did not know Fawbush's name; he only knew her as "Tia". Transcript, R. 527, Page ID# 104.

An Extraction Report was subsequently generated from Ibarra's Samsung phone, which showed text messages between the two phone numbers believed to be Ibarra and Fawbush between the dates of July 14, 2015 through August 27, 2015. Transcript, R. 527, Page ID# 113-114. These text messages also included

another name, Summer, (believed to be Summer Jones), who was present at Fawbush's residence when the search warrant was executed on August 27th. Transcript, R. 527, Page ID# 115-116. A text message dated August 27, 2015, and recovered from the Samsung phone, indicated Ibarra was questioning Fawbush if the new confidential informant "Ron" was safe to purchase methamphetamine from them. Transcript, R. 527, Page ID# 116-117. Other text messages between Ibarra and Fawbush indicated some monetary transactions involving them and other individuals; but these messages also included communications regarding mechanic and repair work on automobiles. Transcript, R. 527, Page ID# 117-119. The call history from the Samsung phone included calls made to and from numbers associated with the country of Mexico. Transcript, R. 527, Page ID# 121.

An extraction report was similarly generated from the ZTE phone and it also included text messages and calls to and from numbers associated with numbers assigned in Mexico. Transcript, R. 527, Page ID# 124. The cell phone extraction reports indicated the defendant, Ibarra, was also known as "Tio". Transcript, R. 527, Page ID# 125. The ZTE phone included text messages with a Mexican phone number believed to be used by Jose Santana. Transcript, R. 527, Page ID# 125-126. There were text messages between the ZTE phone and the number associated with Jose Santana that are consistent with the charges against Ibarra; specifically, text messages with strings of numbers which were now known to be Wells Fargo bank account numbers. Transcript, R. 527, Page ID# 132-133. There were also various text messages between the ZTE phone number and the numbers associated with Mexican numbers (Santana's phone number specifically) leading up to and after the controlled buys in this case. Transcript, R. 527, Page ID# 133-135. The information seized in the cell phones and google accounts from the cell phones were consistent with drug trafficking; and as such Pack obtained a search warrant and seizure of the contents of both Wells Fargo bank accounts; one Wells Fargo account associated with Jose Santana and the other associated with Sigifredo Salce Garcia. Transcript, R. 527, Page ID# 137. Pack noted Ibarra had

several deposit receipts from Wells Fargo Bank found on his person the day he was arrested.  Transcript, R. 527, Page ID# 137.  Pack interviewed Misty Munsey Killion at Fawbush's residence and Killion confirmed she went with Ibarra to deposit money at Wells Fargo Bank. Transcript, R. 527, Page ID# 138.

On cross-examination Pack testified he believed the co-defendant Kathy Fawbush, was a local distributor in the Whitesburg, Hamblin County and Northeast Tennessee area.  Transcript, R. 527, Page ID# 142.  Kathy Fawbush was arrested the day the search warrant was executed on August 27, 2015; and after such time Fawbush began cooperating with law enforcement. Transcript, R. 527, Page ID# 144.  Pack acknowledged Fawbush was probably using methamphetamine and selling to support her habit.  Pack did not believe Fawbush owned many assets, and in fact, Pack testified her trailer may have been inherited and only a little over a thousand dollars were seized from Fawbush's trailer. Transcript, R. 527, Page ID# 143-145.  Pack admitted some of the items also found in the trailer, such as plastic baggies, scales, or even large amounts of cash could also be used for non-illicit or illegal purposes. Transcript, R. 527, Page ID# 145-146.  Pack acknowledged that generally confidential informants provided information or worked with law enforcement because they were seeking some sort of benefit in relation to an offense they have committed. Transcript, R. 527, Page ID# 148.  As a matter of course the opinions of officers as to the amount of cooperation by an individual is particularly relevant regarding the penalties (i.e.; more harsh or lenient) for committing those illegal acts. Transcript, R. 527, Page ID# 148.  Kathy Fawbush in particular had a lengthy criminal drug trafficking history. Transcript, R. 527, Page ID# 152.  Fawbush was helpful to his investigation because she was involved in drug trafficking most of her life; and, as such she had made some type of arrangement or agreement with Pack regarding a plea for her benefit.  Transcript, R. 527, Page ID# 153.

Pack also acknowledged that the use of cell phone data to determine the location of the cell phone at any particular time were not specific as to addresses; and instead specific only as to general areas. Transcript, R. 527, Page ID# 153-154. Juan Solis, aka Bird, was interviewed as a result of this investigation. Solis subsequently provided information regarding drug trafficking to law enforcement; and as consideration for that information, Solis may also receive a negotiated plea arrangement taking into account that cooperation. Transcript, R. 527, Page ID# 155. Pack acknowledged the Ibarra was not present at the two (2) previous confidential informant controlled buys at Kathy Fawbush's residence. Transcript, R. 527, Page ID# 155. Although Pack believed Ibarra may have been present at Fawbush's residence, his voice was not heard on either of those two controlled buys. Transcript, R. 527, Page ID# 155-156. Pack testified cash found at Fawbush's residence contained some of the marked currency used in their investigation and some of that cash was left in Fawbush's possession. Transcript, R. 527, Page ID# 157-158.

When Pack interviewed Ibarra on August 27th Ibarra informed him that he did not sell drugs. On that day both Ibarra and Fawbush stated Ibarra was a mechanic and was there in a mechanic's capacity. Transcript, R. 527, Page ID# 159. However, Fawbush also informed law enforcement she had obtained methamphetamine from Ibarra on that day. Transcript, R. 527, Page ID# 159.

Typically people involved in drug trafficking would have ledger books or some sort of business record of drug transactions; however, no drug ledgers were found at Fawbush's residence. Transcript, R. 527, Page ID# 159. Pack acknowledged that many of the text messages, viewed in isolation, would not necessarily be referring to drug trafficking and drug transactions. Transcript, R. 527, Page ID# 160-161.

The following day, JOHN BRIAN PADGETT was recalled by the Government and he confirmed he had taken Ibarra's statement in June or July of

2013; and at that time Ibarra told him that the $5,600 found in his room were proceeds from gambling.  Transcript, R. 528, Page ID# 4.

DAVID BISHOP, a Special Agent for the FBI was asked to join the methamphetamine conspiracy investigation in August of 2015; however, he primarily assisted in execution of the search warrant on August 27, 2015. Transcript, R. 528, Page ID# 6-7.  Bishop was one of the first officers to arrive at Fawbush's residence on August 27th, and when he first entered the residence the Defendant, Ibarra, was found in the living room.  Transcript, R. 528, Page ID# 8. Bishop assisted in searching Ibarra on the scene; and confirmed two cell phones (ZTE and Samsung), a Mexican passport, and other photo identification with Ibarra's picture were found on his person.  Transcript, R. 528, Page ID# 9-14. Additionally, shards and small pieces of paper were found on Ibarra; and handwritten on some of these shards was the name "Jose Santana", "$5,000", and a string of 10 numbers were written with the last digits reading "0659".  Transcript, R. 528, Page ID# 15.  There were also pink pieces of paper recovered from Ibarra with a series of numbers listed; and all the numbers added up might refer to 44,000. Transcript, R. 528, Page ID# 16.  In addition there were other scrap pieces of paper and each had a string of 10 numbers listed.  Transcript, R. 528, Page ID# 16-17.  Scrap paper also listed an address in Apple Valley, Winchester 22602 and the name Moses Hernandez with an address in Falls Church, Virginia. Transcript, R. 528, Page ID# 17.

The custodial search of Ibarra produced two Wells Fargo Bank deposit slips from store numbers 0068818 and 0068913, both of which listed cash deposits of $5,000 in small denominations of $10, $20, $50 and $100 dollar bills for account numbers ending in 7914 and 0659.  Transcript, R. 528, Page ID# 18-20.  The deposits slips indicated the Wells Fargo bank tellers handling the transactions on August 27th were Lisa and Erin; and both deposits were made late in the afternoon and about thirty minutes between deposits at two separate bank branches.

Transcript, R. 528, Page ID# 20-22.  The string of numbers handwritten on shards of paper found on Ibarra's person are the same string of numbers listed and ending with 0659. Transcript, R. 528, Page ID# 21-22.  Similarly, the phone recovered from Ibarra included text messages dated August 27, 2015 indicated messages from Jose Santana listing an account ended in 0659 which matched the bank deposit receipts of a cash deposit of $5,000.  Transcript, R. 528, Page ID# 24.

Bishop testified agents recovered what he thought appeared to be more drugs at the residence. Transcript, R. 528, Page ID# 24.  During the search of the Fawbush residence, a truck pulled into the driveway of the residence and then sped off; leading Bishop to believe the driver of the truck saw the law enforcement vehicles parked in the driveway and sped off away from the residence. Transcript, R. 528, Page ID# 25.

ADAM ARRINGTON, worked with the Greene County Sheriff's Department, Third Judicial Drug Task Force.  Arrington was working as the director of the drug task force and was present when law enforcement executed a search warrant at the Fawbush residence on August 27, 2015.  Transcript, R. 528, Page ID# 26-27.  Arrington searched the room purporting to be an office with two desks back to back, a computer, and a filing cabinet; and pictures of the room were introduced as exhibits.  Transcript, R. 528, Page ID# 28-32.  The pictures appeared to show different angles of the room with a pipe (purported to be smoking paraphernalia) was seen laying on top of the desk.  Transcript, R. 528, Page ID# 28-32.  The items recovered in the lower portion of the filing cabinet included cash and what appeared to be narcotics in clear plastic packaging. Transcript, R. 528, Page ID# 33-34.

On cross-examination Arrington testified he did not initially know the residence searched on August 27th was Fawbush's residence. Transcript, R. 528, Page ID# 35.  A stipulation was entered as evidence; wherein, the narcotics recovered at the Fawbush residence were tested and the results indicated the clear

plastic package contained methamphetamine. Transcript, R. 528, Page ID# 36. The test results yielded positive identification of methamphetamine in the following amounts: (1) 45.5 grams of actual methamphetamine introduced as Exhibit 20; (2) 14.5 grams of actual methamphetamine introduced as Exhibit 23; (3) 92.8 grams of actual methamphetamine introduced as Exhibit 25 (seized on August 27, 2015); and (4) 91.5 grams of actual methamphetamine introduced as Exhibit 62 (also seized on August 27, 2015). Transcript, R. 528, Page ID# 36-39. Upon questioning by the Court, the Government clarified that the four lab results indicated the actual weight of the substance (the purity percentage); and this number was used as the net weight of the drugs listed above. Transcript, R. 528, Page ID# 39-40.

KATHY FAWBUSH, a co-defendant in this case, was called to testify and she confirmed she was incarcerated at the Washington County Detention Center at the time of her testimony. Transcript, R. 528, Page ID# 41-42. Fawbush acknowledged she had recently entered into a plea agreement for conspiracy to distribute over 50 grams of methamphetamine, which carries a life sentence, and as a condition of this plea she would cooperate with law enforcement in the prosecution of the co-conspirators in this case. Transcript, R. 528, Page ID# 41-42. Fawbush has several previous felony drug convictions in 2009-2010 for initiation of process for manufacture of methamphetamine. Transcript, R. 528, Page ID# 42-43. Fawbush's testified the residence was her mother's and Fawbush retained a life estate until her death. Fawbush had been employed as a truck driver for fifteen years prior to her incarceration. Transcript, R. 528, Page ID# 45. Fawbush claimed she has not received any specific promises from law enforcement in this investigation, but she did acknowledge she had hoped to receive some leniency in her sentence as a result of her cooperation and testimony. Transcript, R. 528, Page ID# 44-45.

Fawbush testified she had also been incarcerated in the past for felony drug convictions, and when she was released from jail in 2011, she returned to the same

residence; and in late 2014, Fawbush began using and selling drugs again. Transcript, R. 528, Page ID# 46.   In late 2014, Juan Solis, also known as "Bird", appeared at her residence asking and looking for "little Dan" who at that time was incarcerated. Transcript, R. 528, Page ID# 46.  Solis was known to Fawbush because Solis and "little Dan" had been at her residence before and discussed drugs on that occasion. Transcript, R. 528, Page ID# 47.  Fawbush testified Solis sold Fawbush a half-ounce of methamphetamine for $700 in late 2014; and she subsequently began distributing methamphetamine for Solis until May of 2015. Transcript, R. 528, Page ID# 48.  Solis would generally sell Fawbush methamphetamine and he was initially accompanied by his uncle, Cuwa, and later the defendant also known to her as "Tio". Transcript, R. 528, Page ID# 48. Typically Solis would sell Fawbush one ounce of methamphetamine; wherein, Fawbush would pay for one-half and then use her proceeds from her sales to pay Solis the other half owed. Transcript, R. 528, Page ID# 48.  Fawbush acknowledged that she used methamphetamine with Solis and "Little Dan"; however, when "Tio" was present Solis did not want her to use methamphetamine. Transcript, R. 528, Page ID# 49-51.  Fawbush identified the Defendant, Ibarra, in the courtroom as the individual she knew as "Tio".  Transcript, R. 528, Page ID# 50.  Solis continued to sell Fawbush methamphetamine, generally in one-ounce quantities; and Ibarra was present during some of those transactions. Transcript, R. 528, Page ID# 52.  Fawbush would generally distribute and sell small amounts of methamphetamine to individual buyers in grams. Transcript, R. 528, Page ID# 51-52.

At some point Ibarra returned to Fawbush's residence wherein he informed her that Solis had been taking pills and not paying him as he should.  Ibarra told Fawbush that she should buy directly from him or an Hispanic man named "Josh" Ibarra had previously introduced to Fawbush. Transcript, R. 528, Page ID# 53-55. Sometime in June of 2015, Ibarra returned to her residence telling her he had fronted Solis ten ounces of methamphetamine; however, Solis never paid Ibarra the

money owed. Transcript, R. 528, Page ID# 55.  Ibarra would from time to come visit Fawbush asking if she had seen Solis. Transcript, R. 528, Page ID# 55.

Fawbush was in the hospital around June 19,  2015, and when she was released she returned to her residence finding Ibarra already present in the residence. Transcript, R. 528, Page ID# 55-58.  Ibarra informed Fawbush that "Josh" had ordered three kilograms from Ibarra but ended up not taking those kilograms; instead Ibarra offered to sell her the three kilograms at a price of $34,000.  Transcript, R. 528, Page ID# 55.  Initially Fawbush resisted informing Ibarra she would be unable to sell amounts that large; however, Ibarra put her in touch with Rick Munsey, aka "Chicken Man". Transcript, R. 528, Page ID# 59-60. Fawbush no longer purchased methamphetamine from Silos; instead Ibarra would bring Fawbush one-half kilograms of methamphetamine at a time to sell. Transcript, R. 528, Page ID# 60-61.  Fawbush started selling larger quantities of methamphetamine from June 19, 2015, until her arrest on August 27, 2015. Transcript, R. 528, Page ID# 62-63.  When Fawbush needed more methamphetamine or needed to give Ibarra proceeds from her sales, she would generally text Ibarra how much money she had to give him and inquire when he would come get that money. Transcript, R. 528, Page ID# 64.  Fawbush acknowledged it was difficult to speak to Ibarra on the phone because she didn't understand Spanish; and instead, she used a Google translator on her phone.  The Google translator helped to some degree; but she acknowledged she mostly spoke with Ibarra in broken English regarding specific information relating to the sale and distribution of methamphetamine. Transcript, R. 528, Page ID# 63-64. Fawbush continued to distribute for Ibarra during this time; earning her own profits from those sales. Transcript, R. 528, Page ID# 66-67.   Fawbush acknowledged Ibarra would work as a mechanic for her and did work on her older automobiles from time to time; however, she considered this a benefit or gift from Ibarra for distributing the methamphetamine. Transcript, R. 528, Page ID# 66-67.  Fawbush continued to sell methamphetamine from her residence during June and July of

2015; using her computer room to handle transactions. Transcript, R. 528, Page ID# 68.  Fawbush claims she never dealt individually with Rick Munsey; except one time when she and Ibarra met on the side of the road close to Fawbush's residence.  Transcript, R. 528, Page ID# 69.  Fawbush didn't overhear Ibarra's conversation with Munsey and she noted she did not believe a transaction took place on that date. Transcript, R. 528, Page ID# 70.  Fawbush noted phone numbers ending in 4022 and 5907 were her cell phone numbers, and she had a third she could not recall. Transcript, R. 528, Page ID# 70.

On July 15, 2015, "Josh" brought an Hispanic man known as "Ron" to Fawbush's residence to purchase methamphetamine; who she later learned was a confidential informant working on the investigation. Transcript, R. 528, Page ID# 72-73.  While Fawbush was initially distrustful of "Ron" she sold the two Hispanic men two ounces of methamphetamine. Transcript, R. 528, Page ID# 72.  Fawbush was shown a photograph of her residence and she acknowledged she knew a woman named Summer in the photograph; noting, Summer generally cleaned her residence or ran errands for her from time to time. Transcript, R. 528, Page ID# 73.  Fawbush testified she generally handled drug transactions in the computer room, storing cash and drugs in the furniture. Transcript, R. 528, Page ID# 74.  On July 15, 2015, Fawbush discussed with them possible future transactions for larger amounts, specifically for the sale of one-half kilograms of methamphetamine for $19,000. Transcript, R. 528, Page ID# 74-75.  Fawbush was asked to listen an audio clip recovered from that July 15th sale and she confirmed "Ron" asked if she could sell him a one-half kilogram of methamphetamine. Transcript, R. 528, Page ID# 76. Fawbush informed "Ron" she would have to check with Ibarra. Transcript, R. 528, Page ID# 76.  About three weeks later, "Ron" returned with the $400 he owed Fawbush from that transaction, and at this meeting "Ron" inquired as to purchasing "rock, not powder".  Transcript, R. 528, Page ID# 76.

On August 27, 2015, "Ron" called Fawbush early in the morning inquiring about purchasing some more methamphetamine. Transcript, R. 528, Page ID# 77. Fawbush did not want to sell to "Ron" because she was still suspicious of him; instead, Misty Munsey Killion was present at the time and had expressed the desire to make some money for herself selling to "Ron". Transcript, R. 528, Page ID# 77. Fawbush had previously texted Ibarra asking if he knew the man Josh brought to her home and was she okay to sell the drugs to him. Transcript, R. 528, Page ID# 78-79. Ibarra later showed up at her residence around noon, parking his vehicle behind the residence. Transcript, R. 528, Page ID# 79. When Ibarra arrived that day Fawbush, Misty Munsey Killion, Summer were already at her residence. Transcript, R. 528, Page ID# 80. Fawbush stated Ibarra had fixed the Jeep and they were intending to discuss how to get the Jeep back to Tennessee. Transcript, R. 528, Page ID# 80. Fawbush gave Ibarra $10,000 in cash for prior sales of methamphetamine and expected they would discuss higher amounts of methamphetamine to distribute. Transcript, R. 528, Page ID# 80. Fawbush had approximately a one-half ounce of methamphetamine remaining from the previous transactions; however, she knew she would need more soon from Ibarra. Transcript, R. 528, Page ID# 80-81.

Around 1:00 P.M. on August 27, 2015, "Ron" arrived at Fawbush's residence with another Hispanic male. Transcript, R. 528, Page ID# 81. A transaction for the methamphetamine took place in the computer room; and she listed the people present were Fawbush, Ibarra, Misty, "Ron", and the new Hispanic man. Transcript, R. 528, Page ID# 82. Misty made the new Hispanic man strip off his clothes down to his knees because of their concern about the new men; even though "Ron" kept insisting he was safe to deal with that day. Transcript, R. 528, Page ID# 82-83. "Ron" and the new Hispanic man ultimately purchased a one-half ounce; and the men inquired about purchasing more that day also. Misty sold them the methamphetamine and walked them outside to their car. Transcript, R. 528, Page ID# 84-85. After the men left Fawbush gave Ibarra $10,000 in cash.

She understood Ibarra paid Misty $100 cash to drive him to the bank to deposit the cash around 2-3:00 that afternoon. Transcript, R. 528, Page ID# 83.

Sometime later that afternoon, "Ron" and the Hispanic man returned to her residence and purchased four ounces of methamphetamine from her; however, Ibarra was not in the computer room during this transaction. Transcript, R. 528, Page ID# 87. Fawbush admitted to telling the men that Ibarra was in fact her mechanic; and that it was dangerous to tell people who her supplier might be for illegal drugs. Transcript, R. 528, Page ID# 87-88. When the men left she and Ibarra were discussing her distrust of the two Hispanic men when law enforcement executed a search warrant for the residence. Transcript, R. 528, Page ID# 88-89. Fawbush agreed to give a statement to Agent Pack informing him that Ibarra was her methamphetamine supplier. Transcript, R. 528, Page ID# 89.

Fawbush confirmed text messages on July 14, 2015, between she and Ibarra referred to $10,000 cash she had for him and he responded he would be there that night. Transcript, R. 528, Page ID# 90-91. Fawbush also confirmed text messages from July 14th indicated she told Ibarra via text that Summer would take $100 for driving Ibarra to the bank. Transcript, R. 528, Page ID# 92. Text messages between Fawbush and Ibarra a few days later indicated Ibarra had returned to Winchester, Virginia. Transcript, R. 528, Page ID# 94. On July 19th text messages between Fawbush and Ibarra indicate she had $10,000 cash to give him from proceeds from the methamphetamine transactions; however, she stated in text she might have more soon if he wanted to wait to come back to her residence. Transcript, R. 528, Page ID# 95. On July 25th Fawbush sent Ibarra a text indicating she would have more money for him soon; and on July 27th Ibarra sent her a text stating he had secured a Ford 500 vehicle for her and he had the keys and bill of sale of that purchase. Transcript, R. 528, Page ID# 96. On July 29th Fawbush sent texts to Ibarra indicating her godson was with her for a few days and she would not be handling methamphetamine transactions during that time.

Transcript, R. 528, Page ID# 99.  On July 31st Fawbush sent a text to Ibarra indicating she did not have $10,000 and she and Ibarra also discussed a Jeep which Ibarra was helping her fix and sell to someone in Virginia. Transcript, R. 528, Page ID# 101.  On August 1st Fawbush sent texts to Ibarra indicating she only had $5,000, and that her normal distributors, Eric and Sheena, had not sold as much as usual. Transcript, R. 528, Page ID# 101-102.

Fawbush confirmed that on August 27, 2015 she gave Ibarra $5,000 in cash from methamphetamine sales. Transcript, R. 528, Page ID# 105.  Fawbush testified she later told law enforcement she gave Ibarra $10,000 instead that day; instead Fawbush stated it was a long time and she may have misspoken initially, but to her knowledge and memory she gave Ibarra $10,000 as proceeds from the sale of methamphetamine. Transcript, R. 528, Page ID# 104-107.  On cross-examination Fawbush continued to claim she made a mistake initially telling law enforcement she gave Ibarra $5,000 in cash on August 27th; but she made a mistake, and she believed it was in fact $10,000. Transcript, R. 528, Page ID# 110-113.  Fawbush also acknowledged she had served six years in jail and upon her release in 2013, she was placed on probation and began cooperating with law enforcement following her release. Transcript, R. 528, Page ID# 115-116.  Fawbush also acknowledged she had an incentive to testify at this trial; hoping for a more lenient sentence as to the length in Federal prison. Transcript, R. 528, Page ID# 119-121.

MARTIN BUSTOS GARCIA is a cooperating witness for the Government. Garcia left Mexico, his birthplace, and moved to North Carolina in the mid-1970's and worked as a farmer in eastern Tennessee for the last 20-25 years.  Transcript, R. 528, Page ID# 124.  In 1998, and again in 2004, Garcia was convicted of conspiracy to distribute marijuana and spent several years in jail as a result. Transcript, R. 528, Page ID# 125-126.  After his conviction in 2004, and upon his release in 2008, Garcia began cooperating with law enforcement in the prosecution of other investigations.  Transcript, R. 528, Page ID# 127.  Garcia admitted to

accepting payment and assistance with his immigration status in the United States as a result of that cooperation. Transcript, R. 528, Page ID# 129. Garcia worked as a confidential informant, purchasing methamphetamine for law enforcement; and as a result, met Ibarra, and later, Kathy Fawbush. Transcript, R. 528, Page ID# 131.

Working at the direction of Agent Pack, on July 15, 2015, Garcia purchased two ounces of methamphetamine from Fawbush. Transcript, R. 528, Page ID# 132-133. On this occasion, Garcia gave Fawbush $2,000 in cash provided by Agent Pack with the understanding he would pay the remaining $400 at a later date. Transcript, R. 528, Page ID# 134. Fawbush met with Garcia in a small room, retrieving clear plastic bags filled with drugs out of a desk in the room. Transcript, R. 528, Page ID# 135. Garcia and Fawbush discussed prices for future transactions and Fawbush told him that she paid $38,000 for a kilo of methamphetamine, and she would sell Garcia a pound for $19,000. Transcript, R. 528, Page ID# 136. Garcia returned to Kathy Fawbush's residence on July 24, 2015, paying her the $400 he owed to her. Transcript, R. 528, Page ID# 137. Garcia inquired about purchasing more methamphetamine; however, Fawbush did not have any inventory at that time. Transcript, R. 528, Page ID# 137. Fawbush told Garcia the methamphetamine was from Mexico. Transcript, R. 528, Page ID# 138.

A few weeks later on August 27th Garcia took another Hispanic confidential informant, who used the name Paco Francisco, to purchase more methamphetamine from Fawbush. Transcript, R. 528, Page ID# 139. When they arrived at the Fawbush residence, there was a car with Virginia plates in the driveway, and other people were already in the home. Transcript, R. 528, Page ID# 140. They all proceeded to the same small room with the desk, where Fawbush inquired as to the new man with Garcia, and insisted he leave the room. Ibarra spoke directly to Garcia in Spanish and she believed Ibarra told him Fawbush

didn't want that many people in the same room for the drug transaction. Transcript, R. 528, Page ID# 142-145. Garcia spoke to Ibarra directly in Spanish, attempting to gain their approval based on their loyalties to another Hispanic. Transcript, R. 528, Page ID# 147. Garcia offered that Jose strip down to his knees to demonstrate his trustworthiness, which he did and when nothing was found, the transaction continued. Garcia offered to strip himself; and he noted Fawbush looked at Ibarra and Ibarra relented stating he was to be trusted, and Garcia was not made to also remove his clothing. Transcript, R. 528, Page ID# 147-148. Garcia purchased one-half an ounce of methamphetamine that day from Fawbush, paying her $550; noting Ibarra was in the room during the transaction. Transcript, R. 528, Page ID# 149.

Garcia returned to the Fawbush residence later the night of August 27, 2015, and purchased four ounces of methamphetamine with $4,300 in cash provided by Pack. Garcia noted Fawbush, Misty Munsey, and Sergio were all present in the same computer room for the transaction. Transcript, R. 528, Page ID# 150. At that time Fawbush had informed them Ibarra was in the other room asleep. Transcript, R. 528, Page ID# 150. When Garcia inquired how Fawbush knew Ibarra, she responded he was a mechanic, but then when further prompted, Fawbush told him Ibarra wouldn't be interested in working for him. Transcript, R. 528, Page ID# 150-151.

On cross-examination Garcia acknowledged his federal conviction in 1998 involved as much as the distribution of ten pounds of marijuana. Transcript, R. 528, Page ID# 152. Garcia was allowed to remain in the United States upon release, however, several years later he was convicted of conspiracy to purchase for resale fifty pounds of marijuana. Transcript, R. 528, Page ID# 153. Although Garcia was required to leave the United States as a result of the felony drug convictions; he was approached and agreed to cooperate with law enforcement in order to remain the United States. Transcript, R. 528, Page ID# 153. While

working as a confidential informant for the FBI Garcia made approximately $3-3,500 per year and he also continued to work as a farmer during this time. Transcript, R. 528, Page ID# 154. Garcia only met Ibarra one time at the Fawbush residence, and he only spoke to Ibarra in Spanish; confirming he couldn't state he ever heard Ibarra speak English. Transcript, R. 528, Page ID# 158. Garcia also confirmed Fawbush informed him that Ibarra was a mechanic. Transcript, R. 528, Page ID# 158.

MISTY MUNSEY KILLION, who is a cooperating witness for the Government, testified she was currently incarcerated in the local Washington County Detention Center pursuant to convictions of conspiracy to distribute methamphetamine and money laundering between 2012 through 2015; and as a result, she was awaiting sentencing at the time of her testimony. Transcript, R. 528, Page ID# 160. Killion acknowledged her lengthy criminal history to include a drug conviction in 2000, promotion to manufacture methamphetamines in 2009, and forgery in 2015. Transcript, R. 528, Page ID# 163. Soon after Killion was released from jail in mid-2015, she began to buy methamphetamine from Kathy Fawbush, a childhood friend, for her own personal use. Transcript, R. 528, Page ID# 164. On August 27, 2015, she was at Fawbush's residence with Summer Jones, and Ibarra ("Tio") whom she had met a few weeks before at Fawbush's residence. Transcript, R. 528, Page ID# 165-166. Killion's impression was that Ibarra was supplying drugs to Fawbush. Transcript, R. 528, Page ID# 166.

On August 27, 2015, Killion was at Fawbush's residence when Ron and Paco arrived at Fawbush's residence to purchase methamphetamine. Transcript, R. 528, Page ID# 167. Fawbush was suspicious of Paco, the new Hispanic male, so they ordered Paco to remove his clothes while they all stood in the small computer room. She believed Ibarra motioned his approval, saying "yes" it was okay to proceed, and Killion sold Ron and Paco one-half an ounce of methamphetamine for $500 or $600. Transcript, R. 528, Page ID# 168. After Ron and Paco left

Fawbush told Killion if she would drive Ibarra to the bank Ibarra would pay her $100.  Transcript, R. 528, Page ID# 168.  Killion drove Ibarra to Wells Fargo Bank in Bristol, Virginia and when they arrived Ibarra communicated with her through hand signals and broken English and told her to deposit the cash.  Ibarra remained in the automobile while she entered the bank and it appeared to her that Ibarra was waiting on further instructions from a phone call.  Transcript, R. 528, Page ID# 170.  The cash had been divided in two separate stacks, $5,000 each, and once they arrived, Ibarra gave Killion a slip of paper with instructions to deposit the cash in a particular account, while Ibarra remained in Fawbush's truck.  Transcript, R. 528, Page ID# 171.  Killion confirmed the deposit slip introduced as Exhibit 66-1 accurately reflected the deposit she made at the first Wells Fargo location.  Transcript, R. 528, Page ID# 172.  Ibarra directed Killion to drive to another bank location, where again Ibarra gave Killion a slip of paper with routing numbers written on it; and she made a deposit of another $5,000 in cash.  Transcript, R. 528, Page ID# 172-173.  Killion gave the deposit slips back to Ibarra after each transaction; and she confirmed the total was $10,000 cash that day.  Transcript, R. 528, Page ID# 175.

When Killion and Ibarra returned to Fawbush's residence, Killion called Ron and Paco, to inform them that they could purchase more methamphetamine.  Transcript, R. 528, Page ID# 175.  Later that day Ron and Paco returned to the Fawbush residence and purchased four ounces from Killion for $4,300.  Transcript, R. 528, Page ID# 176.

On cross-examination, Killion confirmed she was convicted of sale and delivery of methamphetamine in 2004; and while she was still on probation for the 2004 charge, she was convicted of sale and delivery of counterfeit drugs and violation of probation in 2008.  Transcript, R. 528, Page ID# 177.  When Killion was released from jail in 2015 she was not on probation for the previous charges; and instead she remained on bond for a felony possession of schedule II charge.

Transcript, R. 528, Page ID# 179.   While on bond Killion continued to use methamphetamine.  Transcript, R. 528, Page ID# 180.

Prior to this time in 2008, Killion was married to Ricky Munsey, and until they were separated in 2008 or 2009, they were both using methamphetamine. Transcript, R. 528, Page ID# 180.  Killion confirmed she entered into a plea agreement with the law enforcement, and David Leonard was her attorney. Transcript, R. 528, Page ID# 180-181.  Killion confirmed she bought and sold methamphetamine from Fawbush, as well as used methamphetamine with Fawbush, and in particular during July and August of 2015.  Fawbush did not normally charge Killion for methamphetamine; instead Killion would perform odd jobs for Fawbush, such as cleaning her residence and running errands.  Transcript, R. 528, Page ID# 182-183.  On August 27, 2015, she took it upon herself to handle the transaction with Ron and Paco because Fawbush seemed uncomfortable selling to them; however, Fawbush seemed reluctant to tell Killion too many details about the drug conspiracy or her source.  Transcript, R. 528, Page ID# 182-184.  Killion acknowledged that she was staying at Fawbush's residence on August 27, 2015, and had used methamphetamine that morning.  Transcript, R. 528, Page ID# 185. Killion admitted she was testifying at this trial hoping to gain leniency as a result of her cooperation and perceived credibility.  Transcript, R. 528, Page ID# 188.

ERIN (SLAGLE) DYE who is a Wills Fargo Bank teller at the Abingdon, Virginia branch was called as a witness.  Transcript, R. 528, Page ID# 190.  Dye was working at the Euclid Avenue branch location on August 27, 2015; and she recalled a white female make a deposit of $5,000 divided into denominations of $20 dollar bills.  Dye confirmed she recognized the deposit slip for a deposit of $5,000 on that day and marked as Exhibit 66.  Transcript, R. 528, Page ID# 191-194.  Dye confirmed the last four digits of the account number were 7914. Transcript, R. 528, Page ID# 193.  Dye confirmed a copy of a bank statement for a checking account with the last four digits similarly being 7914 were assigned to

someone named Sigifredo Salce Garcia, whose address listed was 88705 Reynosa Tamps, Mexico. Transcript, R. 528, Page ID# 194. Dye confirmed a consumer account application listed Sigifredo Salce Garcia as the account holder, and the address listed as G. Felix P. De Marquina 325 in Tamps, Mexico. Transcript, R. 528, Page ID# 195.

NANCY MARLISA MUMPOWER, a Wills Fargo Bank employee, was called as a witness. Mumpower was the lead teller working on August 27, 2015. She recalled a white woman in her late 20's make a large cash deposit at her Lee Highway branch close to closing time at 5:00PM. Transcript, R. 528, Page ID# 197. Mumpower recalled the woman entered the bank while speaking on a cell phone. She presented Mumpower with a piece of paper with a handwritten account number and cash with a rubber band around the stack. Transcript, R. 528, Page ID# 197. Mumpower confirmed a deposit slip marked as Exhibit 48 indicated a cash deposit of $5,000 made to an account with the last four digits of 0659, which was confirmed to be that of Jose Santana. Transcript, R. 528, Page ID# 198. Mumpower was presented with a combined bank statement showing the last four digits of 0659 and listing Jose Santana as the owner, whose address was listed as 8011 West Mile 4 Road, Mission, Texas 78574-5155. Transcript, R. 528, Page ID# 200. Mumpower confirmed Exhibit 71 to be a bank account application for the same account listing Santana as the applicant for an account with the last four digits as 0659 including the same address listed in the combined statement as referenced in her earlier testimony. Transcript, R. 528, Page ID# 200-201.

JOSE SANTANA, was called as the last witness of the day. Santana, a native of McAllen, Texas, had recently pled guilty to charges related to conspiracy to distribute methamphetamines. Transcript, R. 528, Page ID# 201-203. Santana confirmed he had already pled to the charges and was similarly awaiting sentencing. Transcript, R. 528, Page ID# 203. As a condition of his plea Santana understood if he cooperated with law enforcement he may receive a sentence

significantly less than a sentence of five to forty years of Federal incarceration. Transcript, R. 528, Page ID# 203.  Santana acknowledged he had prior felony drug convictions in 1993-94 for conspiracy to distribute cocaine and methamphetamine. Transcript, R. 528, Page ID# 204-205.  Santana acknowledged he served 8½ years in prison for state and Federal convictions, until his release in 2009. Transcript, R. 528, Page ID# 206.  Santana was previously associated with a Mexican drug cartel known as Cartel Del Golfo, based likely out of Mexican border towns, such as Matamoros, or other towns between Matamoros and Tamaulipas.  The cartel continued to be a powerful group and drug trafficking organization dealing in drugs, weapons, and prostitution. Transcript, R. 528, Page ID# 206-207.  Their territory was all over the United States and Mexico; and specifically they moved methamphetamine, cocaine, marijuana, and pills across the borders in vehicles, semi-trucks, and cars.  Transcript, R. 528, Page ID# 207-208.

Santana began working for this cartel in the 1990's; and when he lived in the valley in Texas he would move and store drugs for the cartel. Transcript, R. 528, Page ID# 208.  He would generally store various amounts of drugs; and sometimes he would owe large debts to the cartels if the drugs were stolen from his locations. In order to repay any debts to the cartel he would work as a "mule" transporting drugs and handling cash deposits for members of the cartel. Transcript, R. 528, Page ID# 210-211.  In 2012, Santana met Julio Franco, aka Julio Franco-Perez; whom he believed was a very high-up member of the cartel and primarily responsible for shipping the drugs. Transcript, R. 528, Page ID# 212.  During this time Santana believed the cartel moved methamphetamine, cocaine, and marijuana at first, across the border to the United States, and monthly perhaps anywhere from 50 to 300-400 kilograms of drugs a month. Transcript, R. 528, Page ID# 212-213. Santana believed the methamphetamine was manufactured in Mexico, but he did not know where in Mexico. Transcript, R. 528, Page ID# 214.  At some of the cartel's locations Santana witnessed large amounts of drugs being broken apart,

melted down, and reshaped and packaged for resale. Transcript, R. 528, Page ID# 214.

The cartel transported drugs hidden in vehicles, semi-trucks, tanker trucks and taken over the border where they were stored in warehouses and houses in and around the valley near Mission, Texas; and some held as much as 200-300 kilograms. Transcript, R. 528, Page ID# 215-16. Generally, Julio Franco would contact him and at his direction, Santana would distribute drugs to people and locations; and these people were also "mules" or "couriers" who transported and distributed the drugs. These mules or couriers would then transport the drugs throughout the county; and in particular, Winchester, Virginia; Jackson, Mississippi; Fargo, North Dakota, etc. Transcript, R. 528, Page ID# 216-217. Generally Julio Franko would distribute kilograms across the country, with the furthest location costing the most per kilogram. Transcript, R. 528, Page ID# 220. The cartel would generally deposit cash proceeds at Wells Fargo Bank locations because they did not require too much information as long as the deposits were less than $10,000. Transcript, R. 528, Page ID# 221. Santana would at times allow members of the conspiracy to deposit cash into accounts held in his own name. Transcript, R. 528, Page ID# 221.

Santana recalled one member of the conspiracy, Sigifredo Salce-Garcia, who also transported drugs for the cartel. Generally the cartel would pay someone $50 for every $1,000 cash they laundered through their accounts. The account holders would normally withdraw the cash deposited and personally carry it across the border to Mexico. Transcript, R. 528, Page ID# 222. From 2012-2015 Santana believed there was one individual, Ibarra, who distributed methamphetamine for the same cartel. Transcript, R. 528, Page ID# 222-223. He believed a situation arose when the distributer in Winchester, Virginia, was taking too long between transactions. Transcript, R. 528, Page ID# 225-226. Santana believed this person had access to his Wells Fargo Bank account numbers. Transcript, R. 528, Page ID#

226. Santana was shown a bank application he confirmed was his, and the account number ended in 0659. Transcript, R. 528, Page ID# 226-227. Santana confirmed a deposit of $5,000 cash on August 27, 2015, to his Wells Fargo Bank account ending in 0659. Transcript, R. 528, Page ID# 228. Santana recalled he had been in Morehead, Minnesota, at the time so it wasn't his deposit; however, he had used this account for previous transactions involving Julio Franco and the cartel. Transcript, R. 528, Page ID# 228-229. Santana learned of the deposit later that day when Julio Franco called and told him causing an argument between Santana and Franco. Transcript, R. 528, Page ID# 229. Santana confirmed the phone numbers he had provided law enforcement and purported they belonged to members of the cartel, and specifically as to Julio Franco. Transcript, R. 528, Page ID# 230.

On cross-examination, Santana acknowledged he was previously convicted of felony drug convictions for methamphetamine conspiracy charges. Transcript, R. 528, Page ID# 231. Santana confirmed the details of his statement to law enforcement that he had stored drugs for the cartel; but when the drugs were stolen from him, he had been coerced to participate in the distribution of drugs across the border for 3 to 4 years; and Santana believed those drugs were supplied by Julio Franco. Transcript, R. 528, Page ID# 232. Santana confirmed he was being held responsible for only the conspiracy to distribute three kilograms of methamphetamine. Transcript, R. 528, Page ID# 234. Santana also admitted he was working off his debt to the cartel laundering money from drug distribution and sales. Transcript, R. 528, Page ID# 236. Santana admitted he was not being charged with crimes associated with conspiracy to distribute methamphetamine in the other states relating to that conspiracy. Transcript, R. 528, Page ID# 237.

RICKY MUNSEY testified he was currently housed in the Washington County Detention Center as a result of pending drug conspiracy charges for sale of 50 grams or more of methamphetamine. Transcript, R. 529, Page ID# 4. Munsey testified that upon his arrest he did not immediately admit to selling

methamphetamine. Transcript, R. 529, Page ID# 4. Munsey admitted he had a lengthy felony drug history; including several felony convictions involving the sale or delivery of various drugs, to include methamphetamine and marijuana; the manufacturing and possessions with intent to sell methamphetamine; and various other convictions involving drug trafficking. Transcript, R. 529, Page ID# 5-6.

Munsey acknowledged he had already entered a plea for his crimes related to this conspiracy and was currently housed in the local detention center as a result of those convictions. Transcript, R. 529, Page ID# 5. Munsey further acknowledged he entered into a plea agreement with the expectation he would be cooperating with the government provided he credibly testify as to his knowledge of the drug trafficking scheme. Transcript, R. 529, Page ID# 5-7. Munsey acknowledge he was facing a life sentence for his participation in those crimes, and Munsey believed his testimony and cooperation might lessen his punishment to something less than a life sentence. Transcript, R. 529, Page ID# 6-7. Munsey testified he was familiar with the Defendant, Ibarra, and knew him as "Tio"; identifying him as the individual seated at the Defendant's table. Transcript, R. 529, Page ID# 8-9.

Munsey testified he initially met Daniel Starnes and Starnes later introduced Munsey to a Hispanic named Juan (also known to him to be called "Bird" or "Turkey"). At that initial meeting Juan asked Munsey if he could arrange to move more methamphetamine ("dope") when his uncle Ibarra came to town. Transcript, R. 529, Page ID# 9. A few days later Juan brought Ibarra over to Munsey's residence and Ibarra inquired if Munsey would be interested in purchasing and distributing methamphetamine in the future. Transcript, R. 529, Page ID# 11. Munsey admitted to purchasing approximately 10 ounces of methamphetamine that day from Ibarra and "Bird". Transcript, R. 529, Page ID# 11. Munsey claimed during this transaction there was discussion and innuendos regarding their participation in a cartel. Transcript, R. 529, Page ID# 11. Munsey testified "Bird" retrieved the methamphetamine from his vehicle outside, and the three of them sat

together at the kitchen table when Munsey purchased approximated 8-10 ounces of methamphetamine for approximately $8,000.00. Transcript, R. 529, Page ID# 12. Munsey testified Ibarra picked up the money off the kitchen table and upon his request Munsey provided him with a bag for the money. Transcript, R. 529, Page ID# 13. During this transaction Ibarra inquired if Munsey could buy and distribute more methamphetamine in the future and Munsey agreed he would be able to purchase more in the future. Transcript, R. 529, Page ID# 12-13. Munsey testified he would speak to Ibarra on the phone to arrange drug transactions and would generally speak to Ibarra in English. Transcript, R. 529, Page ID# 13.

In one subsequent meeting with Ibarra and "Bird", and at their request Munsey traveled to a trailer park where Ibarra and "Bird" resided, Munsey witnessed other Hispanic looking men who appeared to be taking apart a car. Transcript, R. 529, Page ID# 14. Although Munsey was asked to wait inside the trailer, he believed methamphetamine was hidden inside that car. Transcript, R. 529, Page ID# 14. Munsey testified Ibarra and "Bird" pulled him in the back bedroom where Munsey was shown a plastic bag with an amount of methamphetamine purporting to be one pound of methamphetamine. Transcript, R. 529, Page ID# 15. Munsey stated he saw Ibarra pulling the smaller bag out of a larger bag appearing to contain several other similar plastic bags. Transcript, R. 529, Page ID# 15-16. Munsey gave the men $10,000 and he owed them another $7,000 to pay off the balance of the transaction. Transcript, R. 529, Page ID# 17. Munsey admitted he purchased the drugs and intended to sell the drugs at a later date. Transcript, R. 529, Page ID# 17.

Over the next few months Munsey would purchase methamphetamine from "Bird" and Ibarra, and then distribute to other parties. Transcript, R. 529, Page ID# 18. On one such transaction, Ibarra arrived alone warning Munsey that "Bird" had been arrested and was cooperating with law enforcement. Ibarra warned Munsey if he continued having any dealings with "Bird" then he would no longer work with

Munsey in the future.  Transcript, R. 529, Page ID# 19-20.  Ibarra subsequently brought another man named "Antonio" to future transactions and Ibarra informed him that Munsey he would be dealing with Antonio in future transactions. Transcript, R. 529, Page ID# 21.  During phone conversations and meetings with Ibarra, Munsey admitted Ibarra didn't "talk very good English"; however, he believed Ibarra was telling him that he had to "lay low" as a result of "Bird's" cooperation with law enforcement and he was to deal with Antonio, even if Ibarra was not present.  Transcript, R. 529, Page ID# 21.  Ibarra told Munsey that "Bird" had "ripped him off" and if he worked with "Bird" then he would no longer be working with Ibarra.  Transcript, R. 529, Page ID# 22.  Munsey purchased ten (10) ounces costing $10,000 on that occasion; however, Ibarra gave him the methamphetamine on credit and agreed to come back with more drugs and to collect the money owed in the following few days. Transcript, R. 529, Page ID# 23.  Antonio returned a few days later alone and Munsey paid Antonio for another 3-4 ounces of methamphetamine from him and promised to pay Antonio the remaining debt owed from the last sale for 10 ounces of methamphetamine. Transcript, R. 529, Page ID# 24.

Sometime later Munsey and Ibarra encountered each other on the road by his house and Kathy Fawbush was with Ibarra.  Munsey recognized Fawbush from their previous employment at Berg's Industry.  Transcript, R. 529, Page ID# 24-25. At this meeting on the side of the road, Ibarra attempted to sell him a pound of methamphetamine for $27,000; however, Munsey declined informing Ibarra a pound was too much for him to purchase at one time.  Transcript, R. 529, Page ID# 25.  Munsey confirmed his plea agreement included the purchase of 4.5 kilograms of methamphetamine Transcript, R. 529, Page ID# 26.

On cross-examination Munsey admitted to drug trafficking methamphetamine for several years prior to meeting "Bird" or Ibarra in May of 2015. Transcript, R. 529, Page ID# 27.  Munsey claimed he did not keep track his

profits, but he limited the total profits to approximately $20,000. Transcript, R. 529, Page ID# 30. Munsey confirmed he purchased one pound of methamphetamine from Ibarra and "Bird" on a second transaction at the trailer park where two unknown Hispanic men were outside dismantling the car. Transcript, R. 529, Page ID# 30-31. A third meeting took place between Munsey, Ibarra, and Antonio for money they owed to Ibarra. Transcript, R. 529, Page ID# 31. The next transaction included Munsey, Antonio, Kathy Fawbush, and Jose Beasley. Transcript, R. 529, Page ID# 32. Munsey confirmed that Ibarra spoke "a little bit" of English. Transcript, R. 529, Page ID# 32. Munsey admitted he had not been honest with law enforcement initially; however, he claimed he was telling the truth this time and he hoped the same prosecutors and judge would agree to lessen his sentence as consideration for his cooperation. Transcript, R. 529, Page ID# 34-37. Munsey confirmed he had been previously convicted of several felonies; including receiving stolen property and possession of more than ½ ounce of marijuana in 1988; possession of more than ½ ounce of marijuana in 1987; possession with intent to distribute of methamphetamine in 2002; and possession with intent to distribute of methamphetamine in 2004. Transcript, R. 529, Page ID# 37-38.

ALLEN PACK was recalled as a witness for the Government. Pack was a lead investigator in this case. Transcript, R. 529, Page ID# 38. Pack testified the various phone numbers provided to him were numbers associated with members of the conspiracy; noting they included Kathy Fawbush (numbers ending in 4022, 5907, and 2335); Rick Munsey (numbers ending in 3161 and 4197); and Ibarra (numbers ending 0352 and 5794). Transcript, R. 529, Page ID# 39-40.

Pack testified a report had been generated comparing cellular phone numbers and their histories; leading them to another conspirator later identified as Julio Franco-Perez. Furthermore, the two phones confiscated from Ibarra on August 27, 2015, and were registered to the same phone numbers. Transcript, R.

529, Page ID# 40-41. Pack testified as to a report that detailed text and phone call messages between Ibarra, Rick Munsey, and Kathy Fawbush; and they occurred during the time frame for this methamphetamine drug trafficking scheme. Transcript, R. 529, Page ID# 42-44. The report also established that phone calls and text messages between Ibarra and Julio Franco-Perez were found on both phones recovered from Ibarra between the June 5, 2015, and August 27, 2015. Transcript, R. 529, Page ID# 44.

The Government learned of the Wells Fargo bank accounts when Ibarra was arrested and searched on August 27, 2015. The search netted two Wells Fargo Bank deposit slips; and they subsequently learned the two Wells Fargo bank accounts belonged to Jose Santana and Sigifredo Salce-Garcia. Transcript, R. 529, Page ID# 45. Pack testified that people involved in drug conspiracies and money laundering would normally deposit amounts less than $10,000 to various bank accounts, so as to not raise red flags with the bank or government. Transcript, R. 529, Page ID# 46-47. Pack opined that even though they did not find any drug ledges, that a slip of paper with numbers listed on it contained concealed information and were in fact drug transactions relating to amounts and debts for those drug sales. Transcript, R. 529, Page ID# 48. Pack investigations in other drug trafficking scheme generally included the flow of money from the distributors to the source of the methamphetamine; and similarly was in this case Transcript, R. 529, Page ID# 49-51.

ROBERT CLAYTON ("CLAY") SIMMONDS, a Special Agent for the Federal Bureau of Investigation, testified as to his experience and training regarding cellular analysis; and as such was familiar with the AT&T records in this case. Transcript, R. 529, Page ID# 53-55. Simmonds discussed a report he generated involving this case and opined law enforcement had been able to track the general locations of individuals through use of their cellular records and the typical three sector cellular towers involving phone numbers specific to this

conspiracy case.  Transcript, R. 529, Page ID# 56-57.  Simmonds testified that his analysis showed locations of the cellular phones associated with Ibarra in the east Tennessee, North Carolina, South Carolina, and northern Virginia covering the time periods of June 2015 through July 2015.  Transcript, R. 529, Page ID# 59. In his mind the report demonstrated a phone associated with Ibarra had traveled to the same general vicinity as Kathy Fawbush's residence in Whitesburg, Tennessee, and the northeast district of Virginia between the dates of June 11 through July 2015.  Transcript, R. 529, Page ID# 60-62.  Specifically, the report indicated Ibarra's phone remained in northern Virginia between the dates of June 11 until June 20, 2015.  Transcript, R. 529, Page ID# 62-64.  The report also indicted Ibarra's phone traveled from northern Virginia to eastern Tennessee beginning on June 21 and returning two days later to the area of Winchester, Virginia on June 25, 2015.  Transcript, R. 529, Page ID# 64-65.  This route was repeated on June 29 through July 4 of 2015; and these routes similarly indicated Ibarra's phone traveled between northern Virginia and the eastern Tennessee Kathy Fawbush residence. Transcript, R. 529, Page ID# 65-66.  Ibarra's phone also appears to have traveled between the same routes on July 7, 2015, and returning the following day to the Winchester area in northern Virginia.  Transcript, R. 529, Page ID# 66.  Ibarra's phone was thought to have similarly traveled the same route on July 15 and 16th of 2015. Transcript, R. 529, Page ID# 68.

The Government concluded their case at the conclusion of Simmond's testimony.  Defendant Ibarra did not present any evidence in. Transcript, R. 529, Page ID# 69.

This trial court denied Defendant's motion for a judgment of acquittal and closing arguments continued after a short break. Transcript, R. 529, Page ID# 70.

## SUMMARY OF THE ARGUMENT

In its case-in-chief, the government introduced evidence of cell site location information. Cell site location information is telephone technology which tracks the general location of a cell phone based upon the cell phone towers which receive/transmit cellular telephone calls. While this information is not precise, it can track the movement of a cell phone and consequently the person in possession of the cell phone from one cell tower area to another. In the Ibarra case, that data was used to map the travel of Ibarra from northern Virginia to east Tennessee. Prior to the decision in the case of Carpenter v. United States, No. 16–402. Argued November 29, 2017—Decided June 22, 2018, 585 US ____, such information could be obtained by a court order and no search warrant was required. That procedure was followed in the Ibarra case. *Carpenter* held, however, that such information could only be obtained by a search warrant. Ibarra therefore argues that the admissibility of the cell site location information in his case was improperly admitted even though no objection thereto was made pretrial or at trial.

**ARGUMENT**

Standard of Review

A new rule for the conduct of criminal prosecutions applies retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a "clear break" with the past. Griffith v. Kentucky Brown v. United States, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed. 2d 649 (1987)

Discussion of the Issues

The government charged defendant Ibarra with conspiracy to distribute more than 50 grams of methamphetamine, aiding and abetting the distribution of methamphetamine, and conspiracy to commit money laundering. It was the government's position that Ibarra was a leader in this activity and that pursuant to that role he directed the activities of numerous individuals, including Kathy Fawbush, Martin Busto Garcia, Misty Munsey Killion, Jose Santana, and Ricky Munsey. The government sought to prove its case by establishing the following: (1) the existence of the conspiracy; (2) the relevant members of the conspiracy, though not necessarily all members thereof; (3) the role and conduct of various members of the conspiracy, particularly the defendant, Rodolfo Ibarra Banuelos; (4) and, the quantities of methamphetamine attributable to the conspiracy.

In order to prove its case the government called witnesses employed by various law enforcement agencies, bank employees, and alleged co-conspirators.

Each of the co-conspirators testified that Ibarra was a member of the conspiracy and a leader. Each co-conspirator detailed specific conduct of the defendant. While law enforcement officer/witnesses detailed instances of Ibarra's movements and his presence where drug activity and transactions occurred, not one of those witnesses testified that he engaged in a drug transaction with Ibarra or witnessed a drug transaction to which Ibarra was a party. The trial court instructed the jury on the effect of accomplice testimony in accordance with the prevailing law as enunciated in U.S. v Stulga, 548 F 2d 142 (6th CCA, 1978), which held that the testimony of an accomplice alone, if believed by the jury, may be of sufficient weight to sustain a verdict of guilty, even though not corroborated or supported by other evidence if the jury believes that unsupported testimony beyond all reasonable doubt.

Each accomplice acknowledged that he/she had received or hoped to receive favorable consideration in sentencing as a result of his/her cooperation and testimony in this case. The defendant, therefore, concedes that pursuant to the

prevailing law the jury could convict the defendant of the charges in the indictment if the jury believed the unsupported accomplice testimony beyond a reasonable doubt.  In this case, though, the accomplice testimony was not unsupported.  The defendant does not argue that there was no corroborative evidence of the accomplices testimony.  There was such evidence.  One particular piece of corroborative evidence was the cell site location information that was introduced in the trial thru the testimony of two witnesses, David Pack, (Transcript, R. 527, Page ID# 40 et seq) and Robert Simmonds (Transcript, R. 529, Page ID#53 et seq).  While the direct testimony of accomplices implicating the defendant can be sufficient to support a conviction, the introduction of the cell site location information was intended to corroborate the accomplices' testimony, thus influencing the jury to the extent that they would believe the accomplices' testimony beyond a reasonable doubt.  Granted, the cell site location information did not directly corroborate every accomplices testimony.  For instance, the cell site location evidence did not directly corroborate the testimony of Jose Santana regarding the money laundering charges, but that is not to say that testimony did not bolster his testimony.  The cell site location information did tend to corroborate the testimony of Misty Munsey Killion.  She testified that she made two cash bank transactions at the direction of Ibarra.  These cash transactions were credited to a bank account controlled by Jose Santana.  Arguably, the cell cite location information influenced the jury to believe Killion's testimony and her testimony tended to corroborate Santana's.

The cell site location information testimony was presented without objection from the defendant.  At the time of the trial, acquisition of such evidence did not require a search warrant and none was obtained.  The information was secured by a statutorily mandated court order, R. #137-1.  Subsequently, the United States Supreme Court ruled in the case of Carpenter v. United States, (No. 16-402, June 22, 2018), that cell site location information must be obtained by means of a search warrant, absent exigent circumstances.  A newly declared constitutional rule will be

applied to criminal cases pending on direct review, Griffith v. Kentucky, 479 U.S. 314, 322 (1987).

The defendant recognizes that corroborating evidence is not required to support a conviction based upon accomplice testimony, nor does he assert that there was no other corroborating evidence. The government, though, offered the cell site location information as corroboration of such testimony and it cannot be said at this point that such evidence did not influence the jury to credit the accomplices testimony. When evidence is improperly admitted, the defendant is entitled to a new trial unless the appellate court can state beyond a reasonable doubt that the improper admission of such evidence did not and would not affect the jury verdict, United States v. Clayton, 418 F.2d 1274 (6th Cir., 1969).

## CONCLUSION

The defendant asks that the Court hold that the cell cite location information was inadmissible evidence because of the failure by the government to obtain a search warrant; that it cannot be determined beyond a reasonable doubt that the admission of this evidence did not affect the jury verdict; and that, therefore, the judgment of conviction is set aside and a new trial ordered.

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) this document contains 12,942 words.

Counsel for the Appellant/Defendant:

/s/James T. Bowman

Attorney at Law (BPR 000940)

128 E. Market Street

Johnson City, TN  37604

/s/Helen Nicole Himebaugh

Attorney at Law (027684)

128 E. Market Street

Johnson City, TN 37604

## ADDENDUM

1.  R. 40, Superseding Indictment
2.  R. 486, Pre-sentence Investigation Report
3.  R. 513 Judgment
4.  R. 518, Notice of Appeal
5.  R. 531, Order (allowing late filing of notice of appeal)